UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| -against- | : | 23-CR-363 (VSB) |
| LEPIDO RAMIREZ RODRIGUEZ, | : | **OPINION & ORDER** |
| Defendant. | : | |

VERNON S. BRODERICK, United States District Judge:

Defendant Lepido Ramirez Rodriguez ("Defendant") is charged with one count of Illegal Re-Entry of a Previously Removed Alien, in violation of 8 U.S.C. § 1326(a) and (b)(2). (Doc. 6 ("Indictment").) On December 16, 2025, the Second Circuit held that the February 11, 2000 removal order ("2000 Removal Order"), upon which the instant charge is based, was fundamentally unfair and that Defendant had suffered prejudice. (Doc. 49, Doc. 50 (February 25, 2026 mandate).)

Before me is Defendant's motion to dismiss the Indictment under 8 U.S.C. § 1326(d) based on the remaining questions in this case: whether he exhausted his available administrative remedies and whether the removal proceedings improperly deprived him of the opportunity for judicial review, allowing him to collaterally challenge his removal order under 8 U.S.C. § 1326(d). (Docs. 55, 56 ("Mot.").) For the reasons articulated below, I find that Defendant has not satisfied the remaining gatekeeping requirements of § 1326(d), and his motion to dismiss is DENIED.

## I. Factual Background[1]

Defendant, who is 67 years old, was born on August 8, 1958 in the Dominican Republic. (Doc. 15-1.) He became a legal permanent resident of the United States on September 14, 1990. (Mot. 3; Doc. 22-2.) On July 22, 1999, Defendant was convicted of second-degree criminal sale of cocaine, in violation of N.Y. Penal L. ("NYPL") § 220.41. (Doc. 22-9.) Defendant was sentenced to five years to life imprisonment. (*Id.*)

Following this conviction, the Government initiated removal proceedings against Defendant. (Doc. 22-2.) On December 17, 1999, Defendant appeared before an immigration judge ("Immigration Judge" or "IJ") by video from the Riverview Correctional Facility, where he was serving his sentence for his state conviction. (Mot. 4; Doc 56-1 at 00:00-00:40.) Since Defendant only spoke Spanish, a translator was present at this hearing. (Doc. 56-1 at 00:00-00:40; 00:41-00:48.) Although there was a translator present, Defendant did not have legal counsel. (*Id.*) The IJ provided Defendant with a document containing his "appeal rights," further explaining that "[this] paper tells you that if any judge ever sends you out or orders you deported, that paper will help you appeal your case if you decide to do that." (*Id.* at 00:57-01:21). The IJ did not confirm that Defendant understood this statement. Moreover, the IJ told Defendant that "you are in this court because immigration services wants you deported" and that "even though you have been a resident here for more than nine years, they want to deport you because they say you've been convicted of selling cocaine in this country." (*Id.* at 02:28-02:55.) Defendant was also advised by the IJ that although the IJ did not have a list of available free legal counsel, Defendant had the right to be represented by counsel at his own expense or for

[1] For purposes of this Opinion & Order, I assume familiarity with the background of this case as described in my prior Opinion & Order, (Doc. 27), and as detailed in the Second Circuit's Opinion, (Doc. 49), and summarize only the facts necessary for this Opinion & Order.

free. (*Id.* at 01:22-01:41; 03:00-03:35.) After Defendant informed the Immigration Judge that he would like an opportunity to try to find counsel to represent him, the IJ adjourned the proceeding to February 11, 2000. (*Id.* at 03:35-04:47.) The Immigration Judge confirmed that this was the only adjournment Defendant would receive and that he would "try [Defendant's] case without a lawyer" at the February proceeding if Defendant was not able to obtain counsel. (*Id.* at 04:47-05:12.)

On February 11, 2000, Defendant again appeared for the conference by video from the Riverview Correctional Facility with a Spanish interpreter to assist him. (*Id.* at 06:22-06:48.) At this hearing, he stated that he was unable to obtain counsel because he did not have money. (*Id.* at 07:01-07:07.) The Immigration Judge determined that Defendant would represent himself at the proceeding, because he "had more than a reasonable time to get [his] own lawyer." (*Id.* at 07:07-07:23.) Further, the IJ outlined Defendant's procedural rights, stating that Defendant may present and object to evidence, question witnesses, and "may appeal any final decision to the Board of Immigration Appeals." (*Id.* at 07:25-07:48.) Although the IJ reviewed certain rights with him, the IJ did not confirm whether Defendant understood the rights, and the IJ swore Defendant in to begin questioning. (*Id.* at 07:48-08:03.)

During this proceeding, Defendant admitted that he was a citizen of the Dominican Republic and a lawful permanent resident of the United States, (*id.* at 08:22-09:10), that he had been convicted on July 22, 1999 of sale of cocaine in the second degree, and that he was serving a prison term for that conviction, which he had not appealed, (*id.* at 09:10-09:45). After informing Defendant that his drug conviction was final, the Immigration Judge made several factual findings: (1) that Defendant could be removed from the United States based on his drug conviction; and (2) that he could also be deported because his conviction was an aggravated

felony. (*Id*. at 09:45-10:27.) The IJ concluded by stating: "Mr. Ramirez, you can't stay in this country because of your selling of cocaine conviction." (*Id*. at 10:33-10:46.) Subsequently, the IJ ordered Defendant deported and asked him where he wanted to go. (*Id.* at 10:46-10:55.) In response, Defendant said that he "wished to stay here," that "[he has] five children," and that he "came here legally." (*Id.* at 10:55-11:06.) The IJ reiterated that he ordered Defendant deported and informed him that "this will be the last time I ask you, where do you want to go sir?" (*Id.* at 11:06-11:16.) Again, the IJ told Defendant that he "[would] not stay in this country." (*Id.* at 11:16-11:21.) Defendant exclaimed: "To my country. I'm leaving. I'm leaving. I'm leaving." (*Id.* at 11:21-11:25.) The IJ then ordered Defendant to be deported to the Dominican Republic and said: "You can appeal this decision, or you can make it final today, it's up to you." (*Id.* at 11:25-11:40.) Defendant then responded: "No, I don't want to do anything, I just want to leave this country." (*Id.* at 11:40-11:45.) The IJ stated, "that's what we want for you, Mr. Ramirez." (*Id.* at 11:45-11:51.) Reacting to the IJ's statement, Defendant responded: "I know, that's what I know, you want to get me out of here." (*Id.* at 11:51-11:56). The Immigration Judge did not explain anything further to Defendant. Instead, he added that "[w]e have enough citizens in this country selling drugs. We don't need aliens doing it." (*Id.* at 11:57-12:09.)

Following the hearing, the IJ issued the 2000 Removal Order. (Doc. 22-13.) The 2000 Removal Order stated, among other things, that "respondent has made no application for relief from removal." (*Id.*) Moreover, the Immigration Judge crossed out "has made no application" on the removal order and instead added a handwritten notation that Defendant was "not eligible for relief from removal." (*Id.*) The form noted that the appeal had been "waived," and the IJ crossed out the appeal due date, which was originally listed as March 13, 2000. (*Id.*) After completing his state sentence for the drug conviction, Defendant was released to immigration

custody and was deported to the Dominican Republic on April 30, 2001. (Doc. 22-12.)

In the following two decades, Defendant returned to the United States twice, both times without authorization. (Doc. 49 at 4.) In or around 2022, Defendant again reentered the United States without authorization and was charged with one count of illegal re-entry, in violation of 8 U.S.C. § 1326(a) and (b)(2). (Doc. 6.)

## II. Procedural History

On November 8, 2023, Defendant filed a motion to dismiss pursuant to 8 U.S.C. § 1326(d)'s collateral attack provision, challenging the validity of the 2000 Removal Order. (Docs. 14, 15.) He argued that the 2000 Removal Order was invalid and thus fundamentally unfair because it was predicated on a conviction for which he was not removable, and that his failure to exhaust any available administrative remedies or seek judicial review following his removal proceedings was excused as a matter of law. (*Id.*) On March 7, 2024, I denied Defendant's motion to dismiss, finding that he did not suffer prejudice as a result of the 2000 Removal Order. (Doc. 27.) Because I denied his motion based on failure to establish prejudice, I did not address "whether Defendant's failure to exhaust his administrative remedies and failure to seek judicial relief bars his collateral challenge to the validity of the removal order." (*Id.* at 7–8 n.3.)

On April 15, 2024 Defendant entered a conditional guilty plea that permitted him to file an appeal related to his motion to dismiss, (Doc. 32), and on July 24, 2024 was sentenced to a thirty-month term of incarceration, followed by three years of supervised release, (Doc. 42).

Defendant subsequently appealed my motion to dismiss decision to the Second Circuit. (Doc. 41.) On December 16, 2025, the Second Circuit vacated my decision, finding that the 2000 Removal Order was fundamentally unfair and that Defendant had suffered prejudice. (Doc.

49 at 14.) In its decision, the Second Circuit stated that the 2000 Removal Order, "the *only* removal order," was "invalid and that [Defendant] was prejudiced based on the facts as they existed at the time of that removal proceeding." (*Id.* (emphasis in original).) Moreover, the Second Circuit explained that the Government's argument—that the motion to dismiss should still be denied even if prejudice is established because Defendant "did not satisfy the requirement to demonstrate administrative exhaustion and that he was deprived of the opportunity for judicial review"—is "best left to the district court to resolve in the first instance." (*Id.* at 14–15.)

On March 31, 2026, I held a status conference with the parties to vacate Defendant's sentence and set the briefing schedule for his anticipated motion to dismiss. On April 30, 2026, Defendant filed his motion to dismiss, (Doc. 55), and an associated memorandum of law with an attached exhibit, (Mot.). On May 14, 2026, the Government filed its opposition, (Doc. 57 ("Opp'n")), and on May 21, 2026, Defendant filed his reply, (Doc. 58 ("Reply")).

## III. Legal Standard

"Once a noncitizen is removed, it is a crime to return to the United States without authorization." *United States v. Palomar-Santiago*, 593 U.S. 321, 324 (2021) (citing 8 U.S.C. § 1326(a)). Although the statute criminalizing unlawful reentry originally did not "allow defendants to raise the invalidity of their underlying removal orders as an affirmative defense," the Supreme Court later explained that at minimum, "a collateral challenge to the use of a deportation proceeding as an element of a criminal offense must be permitted where the deportation proceeding effectively eliminates the right of the [noncitizen] to obtain judicial review." *Id.* (quoting *United States v. Mendoza-Lopez*, 481 U.S. 828, 839 (1987)).

In response, Congress enacted 8 U.S.C. § 1326(d) in 1996, which establishes specific requirements "that a defendant must satisfy to mount a collateral attack on a prior deportation

order when that order serves as a predicate element of an illegal reentry charge under which the defendant is currently being prosecuted." *United States v. Mejia*, 173 F.4th 28, 33–34 (2d Cir. 2026). A defendant seeking to collaterally attack a prior removal order must show that: (1) he "exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived the [noncitizen] of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair." 8 U.S.C. § 1326(d). "Put simply, Congress sought to guarantee each defendant one full and fair opportunity to challenge a removal order." *Mejia*, 173 F.4th at 34. The Supreme Court has made clear that, "each of the statutory requirements of § 1326(d) is mandatory." *Palomar-Santiago*, 593 U.S. at 329. "The immigration judge's error on the merits does not excuse the noncitizen's failure to comply with a mandatory exhaustion requirement if further administrative review, and then judicial review if necessary, could fix that very error." *Id.* at 328. In other words, "a defendant who neglected the remedies available to him [is not entitled to] a second opportunity to challenge that order collaterally in a later criminal proceeding." *Mejia*, 173 F.4th at 34.

## IV. <u>Discussion</u>

The Second Circuit's decision establishes that Defendant's 2000 Removal Order was fundamentally unfair and prejudicial, satisfying the third prong of § 1326(d). (Doc. 49 at 14.) Therefore, the only issues that remain is whether Defendant has also satisfied the first and second prongs of § 1326(d)'s gatekeeping requirements. Defendant argues that he has satisfied the first and second prongs, contending that: (1) administrative remedies were not functionally "available" to him, so he could not exhaust these remedies, as required under 8 U.S.C. § 1326(d)(1), (Mot. 7–10); and (2) he was improperly deprived of an opportunity for judicial

review under 8 U.S.C. § 1326(d)(2), (*id.* at 10–11). In response, the Government argues that the Defendant's subjective understanding of his appellate rights does not impact the analysis concerning whether these administrative remedies were actually available, and that Defendant expressly waived this right after the Immigration Judge correctly and repeatedly informed the Defendant of his right to appeal. (Opp'n 3–5.) I evaluate each argument in turn.

### A. *Exhaustion of Available Administrative Remedies*

First, Defendant argues that § 1326(d)(1), which requires defendants to demonstrate the exhaustion of "any administrative remedies that may have been available to seek relief against the order," demands that I consider whether Defendant even had "available" remedies to exhaust. Because the IJ "did not correctly inform Mr. Ramirez of his right to appeal, nor did Mr. Ramirez expressly waive this right," Defendant contends that these administrative remedies were not "available" to him in the first place. (Mot. 7–8.) He notes that the IJ did not explain the appeal or waiver process to him, inform him that he had thirty days to consider an appeal, or confirm that Defendant understood his rights. (*Id.* at 8.) Moreover, Defendant argues that the IJ did not confirm whether he affirmatively waived his right to appeal, unlike in *Mejia*. (*Id.*) In response, the Government contends that the "defendant's subjective understanding of his appellate rights—no matter how informed by his use of a Spanish interpreter, education level, and experience with the legal system—has no bearing on whether those administrative remedies were capable of use or accessible to the defendant." (Opp'n 4 (internal quotation marks omitted).) Here, the Government maintains that the Immigration Judge correctly and repeatedly informed the Defendant of his right to appeal. (*Id.* at 4–5.) Thus, Defendant had "available" administrative remedies that he failed to exhaust pursuant to § 1326(d)(1). (*Id.*)

Under Section 1326(d)(1), a defendant must show that he "exhausted any administrative

remedies that may have been available to seek relief against the [removal] order." 8 U.S.C. § 1326(d)(1). Although courts cannot create an "extrastatutory exception" to § 1326(d)(1)'s exhaustion requirement, *Palomar-Santiago*, 593 U.S. at 327, the statute contains a built-in textual requirement that defendants need only have exhausted "such remedies [that] were 'available'" to them. *See United States v. Gutierrez-Campos*, No. 22-438, 2024 WL 3856920, at *2 (2d Cir. Aug. 16, 2024) (citing *Ross v. Blake*, 578 U.S. 632, 643 (2016)). An administrative remedy is "unavailable" for the purposes of § 1326(d)(1), even if it is "officially on the books," if it is not, "practically speaking," "capable of use to obtain relief." *Ross*, 578 U.S. at 643–44.

Addressing analogous statutory language in the Prison Litigation Reform Act, the Supreme Court in *Ross* articulated three circumstances in which a remedy might be unavailable: (1) when the procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved [defendants];" (2) "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use;" and (3) when defendants are "thwart[ed] . . . from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643–44. These three circumstances are not exhaustive, and depending on the facts of the case, other circumstances may exist in which an administrative remedy, though technically available, is incapable of use to obtain relief. *See Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016) (noting that "the three circumstances discussed in *Ross* do not appear to be exhaustive, given the Court's focus on three kinds of circumstances that were 'relevant' to the facts of that case," but declining to "opine on what other circumstances might render an otherwise available administrative remedy actually incapable of use"); *see also Rucker v. Giffen*, 997 F.3d 88, 90, 93–94 (2d Cir. 2021) (finding an administrative remedy to be "unavailable" where the inmate was hospitalized with a critical

medical condition during the five-day window to file a grievance and the jail refused to process any grievance filed after that period). The "test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 311–12 (2d Cir. 2020) (internal quotation marks omitted). Moreover, "[t]o identify when a remedy is incapable of use, and thus unavailable, it is necessary to look to the real-world workings of the immigration court system." *United States v. Valdivias-Soto*, 112 F.4th 713, 731 (9th Cir. 2024) (internal quotation marks omitted).

The Second Circuit has made clear that "Section 1326(d)(1)'s exhaustion requirement turns on the functional 'availab[ility]' of the relevant 'administrative remedies'—not a defendant's subjective understanding of his rights." *Mejia*, 173 F.4th at 36 n.41 (alteration in original) (quoting *Ross*, 578 U.S. at 642). In other words, where "a defendant recognizes that an administrative remedy exists—here, the right to appeal—but elects not to pursue that remedy based on a misunderstanding, the remedy is nonetheless 'accessible' and 'capable of use' to provide relief." *Id.* "Even if the defendant's waiver were not 'considered and intelligent,' that alone would not excuse the defendant's failure to exhaust administrative remedies pursuant to § 1326(d)(1)." *Id.* at 36 n.40 (quoting *United States v. Nunez*, 140 F.4th 1157, 1165 (9th Cir. 2025)). "[A]dministrative remedies are not available for the purposes of § 1326(d)(1) only if the IJ misled the defendant as to the existence or rules of the process for obtaining them." *Nunez*, 140 F.4th at 1164 (internal quotation marks omitted). In *Mejia*, the court found that defendant's administrative remedies were available to him, because he "recognize[d] that an administrative remedy exist[ed]"—"the IJ told Mejia about his right to appeal and did not misrepresent the availability of an appeal or the rules that govern administrative appeals." 173 F.4th at 36 n.41

(internal quotation marks omitted).

Here, although a close call, I find that the administrative remedies were not functionally "available" under section 1326(d)(1) due to the IJ's statements and omissions regarding the appeal process. After the Immigration Judge explained that Defendant could "appeal this decision or . . . make it final today" and Defendant responded that he did not "want to do anything," and "[he] just want[ed] to leave this country," the IJ stated: "that's what we want for you, Mr. Ramirez." (Doc. 56-1 at 11:25-11:51). For the IJ to explicitly state that Defendant's immediate departure from the country was "what [was] want[ed]" right after presenting the option of appeal—with no further confirmation that Defendant understood the existence of his right to appeal—amounts to a "misstate[ment] [of] the rules of the process." *Valdivias-Soto*, 112 F.4th at 732. In addition, the IJ's failure to inform Defendant that he had thirty days to appeal further exacerbated the IJ's misstatement. By failing to tell Defendant that he had thirty days to appeal, this could have given him the impression that he needed to make the decision to appeal during the hearing itself, which he clearly did not need to do. I acknowledge that Defendant was advised of his appeal rights at other points, albeit again without confirmation that he understood the availability of the right or without being told that he had thirty days to file that appeal. (*See* Doc. 56-1 at 00:58–01:21 (Immigration Judge providing the defendant with a document regarding his appeal rights and advising that "that paper will help you appeal your case if you decide to do that"), at 07:25–07:50 (Immigration Judge explaining that the defendant "may appeal any final decision to the Board of Immigration Appeals").) However, the IJ's response right after Defendant explicitly responded to his question about an appeal waiver, without any further confirmation that Defendant understood the right, suggested to Defendant that his only option was leaving the country without further recourse. I find that this exchange constitutes the

type of "misleading statement about appeal rights or procedures" that hinders the functional availability of this right. *Valdivias-Soto*, 112 F.4th at 732 n.14 (internal quotation marks omitted).

Other circumstances here also compound this misleading statement, standing in stark contrast to *Mejia*. In *Mejia*, the IJ expressly confirmed with the defendant that he recognized his right to appeal after the defendant initially stated that "he accepted the [removal] decision." *Mejia*, 173 F.4th at 31 n.8 ("The IJ asked Mejia: 'Do you accept that decision, or do you wish to appeal it,' after which Mejia responded that he accepted the decision. The IJ then asked again, 'You are waiving your right to appeal, correct?' Mejia answered, 'Yes.'"). Although the "availability" of an administrative remedy is not based on a defendant's "subjective understanding of his rights," the Second Circuit made clear that, at base, the availability inquiry requires that the defendant must at least "recognize[] that an administrative remedy exists—here, the right to appeal," even if he elects not to pursue the remedy based on a misunderstanding. *Id.* at 36 n.41. Although, here, Defendant was told of his right to appeal, the IJ did not confirm that he understood the existence of his right to appeal. *See United States v. Gutierrez-Campos*, No. 21-CR-40, 2025 WL 1368819, at *5 (S.D.N.Y. May 9, 2025) (finding that administrative remedies were "available" under § 1326(d)(1) because "the IJ explicitly informed [defendant] of the right to appeal and asked him whether he understood that right—an exchange that was translated into Spanish. . . . [and] [Defendant] confirmed, in Spanish, that he understood he had a 'right to appeal any decision to a higher court.'" (alterations adopted)). Nor did the Immigration Judge explain the appeal process at all or inform Defendant that he had thirty days to consider whether or not to appeal.

Unlike the IJ's explanation and confirmation in *Mejia*, which resulted in an "express[]

waive[r] [of] his right to appeal," *Mejia*, 173 F.4th at 31, here, the Immigration Judge's misleading statement coupled with his failure to confirm that Defendant understood the existence of this right strongly suggest that someone in Defendant's position would not have understood the existence of his appeal rights, and was misled into thinking his only option was to leave the country. His response to the IJ indicated as much when he exclaimed: "I know, that's what I know, you want to get me out of here." (Doc. 56-1 at 11:51-11:56.)

In sum, the administrative remedy of an appeal was functionally unavailable to Defendant. Thus, I find that he has satisfied the first prong of § 1326(d) to collaterally challenge the 2000 Removal Order.

**B. *Opportunity for Judicial Review***

Next, I turn to the second prong of §1326(d)—whether "the deportation proceedings at which the order was issued improperly deprived the [noncitizen] of the opportunity for judicial review." 8 U.S.C. § 1326(d)(2). The Second Circuit most recently clarified that defendants are not deprived of the opportunity for judicial review where "the IJ correctly informed [the defendant] of his right to appeal" and the defendant "expressly waived" this right. *Mejia*, 173 F.4th at 36. However, as discussed above, in light of the Defendant's exchanges with the IJ, he was presumably not properly aware of his right to appeal. *See supra* Section IV.A. The IJ's misleading response to Defendant, made without confirming that he understood the existence of the appeal right, foreclosed the availability of an appeal of the IJ's decision to the Board of Immigration Appeals ("BIA") by Defendant. In turn, because federal courts of appeal can only "review a final order of removal [] if the [noncitizen] has exhausted all administrative remedies available to the [noncitizen] as of right, a requirement that is jurisdictional, not merely mandatory," *Singh v. Napolitano*, 500 F. App'x 50, 53 (2d Cir. 2012) (internal quotation marks

omitted), the unavailability of administrative remedies means that Defendant was also deprived of judicial review through a direct appeal.

Nonetheless, the "availability of habeas review" can also "constitute an opportunity for judicial review." *United States v. Lopez*, 445 F.3d 90, 96 (2d Cir. 2006) (internal quotation marks omitted). Defendant argues that habeas review was not "functionally available" because his opportunity for habeas relief spanned only eleven days from the date that he was transferred to immigration custody, April 19, 2001, to his deportation on April 30, 2001. (Mot. 10–11.) In response, the Government argues that the Second Circuit's prior precedent, which previously mandated that defendants must have a realistic opportunity for habeas review to satisfy § 1326(d)(2), has been abrogated by *Mejia*. (Opp'n 5.) In other words, from the Government's perspective, there is no need for me to consider the time Defendant had to seek habeas relief before he was deported when considering if Defendant was deprived of the opportunity for judicial review—just that habeas review existed is enough.

As an initial matter, Defendant had longer than eleven days to seek habeas relief. The Second Circuit has held that a state prisoner like Defendant who was subject to a final order of removal is in immigration custody and may challenge that custody through a Section 2241 habeas petition. *See Simmonds v. INS*, 326 F.3d 351, 354 (2d Cir. 2003). Indeed, "subjecting an [immigrant] to a final order of removal is to place that [immigrant] in custody within the meaning of the habeas statute." *Id.* This means that Defendant was in custody for purposes of habeas relief between February 11, 2000, his final order of removal, and his deportation on April 30, 2001—a fourteen-month period.[2]

[2] In *Simmonds*, the Second Circuit ultimately determined that it was not prudent to hear the habeas challenge at that particular time, because while the court had jurisdiction over Simmonds' habeas claim even while in state custody, the length of his sentence—an indeterminate life sentence—meant that case law and circumstances could greatly change by the time he was possibly eligible for parole. *See Simmonds*, 326 F.3d at 359–61. Here, this is not the

At this juncture, I do not need to decide whether *Mejia* overturned the Second Circuit's prior precedent that "habeas review must be realistic to satisfy § 1326(d)(2)," as the government argues.[3] *Mejia*, 173 F.4th at 34 n.31 (discussing *United States v. Copeland*, 376 F.3d 61 (2d Cir. 2004)). This is because even under the more liberal standard established by *Copeland* and its progeny, it was "realistically possible" for Defendant to seek habeas relief during this fourteen-month period between the entry of his final order of removal and his deportation. *Lopez*, 445 F.3d at 96; *see also United States v. Gonzalez-Roque*, 301 F.3d 39, 49–50 (2d Cir. 2002) (section 1326(d)(2) requirement was not satisfied where defendant could have filed habeas petition during ten-month period between affirmation of final deportation order by the BIA and actual

---

case for Defendant, since his sentence was not so long as to necessitate a delay in his habeas review because of prudential reasons.

[3] *Mejia* articulated that this Circuit's prior holdings in *Sosa, Copeland*, and its progeny were abrogated "insofar as those cases excused defendants from satisfying the mandatory requirements of §§ 1326(d)(1) and (2)." 173 F.4th at 36. As discussed, this is because the Supreme Court in 2021 established "that all three requirements set forth in § 1326(d) are mandatory for a defendant to meet before he may collaterally challenge his underlying removal order, and that no court may excuse a defendant's failure to satisfy any one of them." *Id.* at 30 (citing *Palomar-Santiago*, 593 U.S. at 328–29). As the *Mejia* court noted, *Sosa* previously recognized "a limited exception that excuses a defendant from these requirements when a defendant's waiver of administrative review was not 'knowing and intelligent.'" *Id.* at 30 (citing *United States v. Sosa*, 387 F.3d 131, 136, 139 (2d Cir. 2004)). "Together, *Sosa*[] [and its progeny,] *Copeland*, and *Calderon* concluded that where an IJ failed to advise a[] [noncitizen] of a potential basis for discretionary relief from removal, or affirmatively misinformed him, we would excuse compliance with all of § 1326(d)'s requirements." *Id.* at 35. *Mejia* makes clear that the §1326(d)(1) and (2) requirements must be independently satisfied and cannot be excused. *Id.* at 36. Thus, abrogating part of the holdings in *Sosa* and its progeny, the Second Circuit explained that "[e]ven if the defendant's waiver were not considered and intelligent, that alone would not excuse the defendant's failure to exhaust administrative remedies pursuant to § 1326(d)(1)." *Id.* at 36 n.40 (internal quotation marks omitted). However, it does not necessarily follow that *Mejia* also abrogates this Circuit's prior holding that where the interval between entry of the final deportation order and the physical deportation is too brief, a noncitizen "[is] denied the opportunity for judicial review [via habeas] within the meaning of § 1326(d)(2)." *United States v. Lopez*, 445 F.3d 90, 97 (2d Cir. 2006). Even *Sosa* distinguishes between excusing the § 1326(d)(1) requirement and statutorily defining, rather than excusing, the § 1326(d)(2) requirement. Although the *Sosa* court "excused [the defendant] from the administrative exhaustion requirement [under section 1326(d)(1)] because his waiver of administrative review was not knowing and intelligent"—which *Mejia* abrogated because courts cannot excuse mandatory gatekeeping requirements—it separately deemed that a defendant who had "no realistic opportunity for judicial review by way of habeas" was definitionally "denied the opportunity for judicial review" under § 1326(d)(2). *Sosa*, 387 F.3d at 137–39. In defining the opportunity for judicial review, *Sosa* did not explicitly excuse the gatekeeping requirement for § 1326(d)(2) on the basis of habeas relief, unlike for § 1326 (d)(1). In any event, as explained, at this time, I do not need to explicitly determine whether *Mejia* also abrogated the holdings of *Copeland*, *Sosa*, and their progenies regarding whether individuals must have a realistic opportunity for habeas review under Section 1326(d)(2).

deportation). Nor was Defendant "erroneously informed by an [IJ] that he was not entitled to seek discretionary relief from deportation under former § 212(c) of the Immigration and Nationality Act," denying him the opportunity for habeas review. *United States v. Moe*, 214 F. App'x 66, 68 (2d Cir. 2007) (finding that Defendant was improperly deprived of judicial review even though there was four-month period between the BIA's dismissal of his appeal and his deportation because an IJ incorrectly informed him that he was not entitled to discretionary relief from deportation during his removal proceedings).

Therefore, I find that Defendant does not satisfy the gatekeeping requirement under Section 1326(d)(2) to collaterally challenge his 2000 Removal Order, because Defendant does not show that he was improperly deprived of the opportunity for judicial review when he had a fourteen-month period to seek habeas relief.

## V. Conclusion

For the foregoing reasons, Defendant's motion to dismiss is DENIED. The Clerk of the Court is respectfully directed to terminate the open motion at Doc. 55.

SO ORDERED.

Dated: August 10, 2026
New York, New York

Vernon Broderick

Vernon S. Broderick
United States District Judge